## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jasser Zaabri

          Plaintiff(s),

v.

Magis, LLC, Magis Construction, LLC,
Christopher Abdul-Haqq,

          Defendants.

CASE NO._____

***AMENDED VERIFIED COMPLAINT***

Plaintiff Jasser Zaabri ("Zaabri") brings this Complaint against the collective Defendants Magis, LLC ("Magis"), Magis Construction, LLC "(MagisLLC"), Christopher Abdul-Haqq ("Haqq"), and states and alleges the following facts in his verified complaint.

This action arises from Defendants' collective and illegal actions using their corporation to engage in illegal acts including: Civil RICO in violation of 18 U.S.C. Section 1964; Breach of Contract, Fraud, Negligent Misrepresentation, Fraudulent Nondisclosure, Unjust Enrichment, and Violation of Minnesota Employment Laws, and Declaratory Judgement.

## __INTRODUCTION__

1.     The employment relationship between Zaabri and the Defendants began in August 2019 when Zaabri was introduced to Haqq who owned several construction companies[1]: Magis, Double G, and Elysian Construction. In particular, Haqq wanted to lure Zaabri into these

---

[1] Upon information and belief, the various Defendant companies share employees, business staffing, and resources and conduct business in Minnesota, North Carolina, Texas, Iowa and Florida. In fact, Magis through their owner Christopher Haqq has stated before a Minnesota administrative board facts connecting Double G Construction to the interworking relationship of Magis.

companies to work as a salesperson and manager after discovering Zaabri's ability to sign clients and make substantial profits for his companies. At this initial meeting, Zaabri discussed his work at a former construction company and his ability to create a powerful sales force teams for the Defendants. Unfortunately, and unknown to Zaabri, the Defendants were not running a legitimate and honest business and eventually refused to pay Zaabri and others for their work. In fact, Defendant Haqq have admitted that he owes Zaabri past wages for his work.

The Defendants also never disclosed to Zaabri that they intended to place false charge backs upon his wages and earnings in violation of Minnesota Employment laws including but not limited to financial penalties for not attending mandatory meetings, refusing to take drug tests, not traveling to certain markets within the United States of America, for not working on weekends, deducting paychecks amounts for customer damage or complaints, fining Zaabri $100, $400, $800.00 for company fines and penalties and deduction in commissions if customer's are not signing a contract with the company within 24 hours, and taking half of the commissions from sales if a customer does not sign with a particular law firm, or go to an adjuster's meeting, or entice the customer to sue the insurance company for payment of jobs.

Zaabri has been determined to be an "employee" by the Minnesota Unemployment Insurance Office and not an independent contractor pursuant to *Ossenfort v. Associate Milk Producers, Inc*., 254 N.W. 2d 672 (1977). However, Zaabri has never been paid wages or overtime for the hours that he worked. The Defendants also failed to pay the appropriate employment wages.

2.    Before meeting the Defendants, Zaabri was an experienced salesperson for several construction companies in Minnesota. However, Defendants were experienced litigants with prior allegations of failing to pay employees for their work, taking aggressive positions

against their employees if they refused to work 7 days a week, pay their "draws" to the company, and created a scheme to cheat hard-working individuals with excessive fines, false reimbursements for housing and other undocumented expenses, and then suing employees for not paying the company. Many times, employees were left working many hours only to learn that they are thousands of dollars in debt with the Defendants.

3.      More troubling is Defendants' history  and pattern and routine in conducting themselves similarly with other employees who claim non-payment of wages.

4.      Defendants Haqq as representative of the Magis Companies eventually hired Zaabri as an "independent contractor" and presented Zaabri an agreement for Zaabri to execute. At a recent employment hearing before the Minnesota Unemployment Insurance Office, Haqq testified that Zaabri was an "independent contractor". However, Zaabri requested that Minnesota determine that he was a bonafide employee for the Defendants.  The State agreed that Zaabri was an employee for the Defendants and not an "independent contractor". Thus, the Defendants are in violation of Minnesota Statutes for violation of wages.

5.      Regardless, Defendants have failed to pay agreed upon commissions and comply with Minnesota employment statutes since 2019 because Zaabri has been identified as an employee. Defendants disregarded that fact and instead paid "commissions" while Zaabri worked overtime, and on weekends.

6.      In particular, Defendants failed to pay Zaabri timely or at all and have significant debts and past wages outstanding to Zaabri in significant back wages, penalties, and other obligations.

7.      In total, the Defendants owe Zaabri an amount of $4,528,683.06 that is accruing daily penalties and interest. Zaabri was not the only victim of Defendants scheme and as

"employees" plan to file lawsuit alleging similar allegations. As such, numerous employees were suckered by the Defendants and have brought or will be bringing their individual lawsuits in Minnesota Federal District Courts.

8.      Defendants' pattern of fraud, failure to pay, hidden accounts, and other malfeasance is predicated on multiple civil and criminal violations of federal and state law, constitutes a pattern of racketeering activity with the threat of future repetition by Defendants warranting judicial relief.

9.      Zaabri recognizes that even if faced with a civil judgment, the Defendants will attempt to avoid collection of the amounts that they owe Zaabri, as the Defendants have other civil and administrative matters that are ongoing. Zaabri brings this action not only to seek financial recovery but also to protect the public from the Defendant's unlawful conduct.

## THE PARTIES

10.      Jasser Zaabri, 10000 Liatris Lane, Eden Prairie, Minnesota 55347.

11.      Magis, LLC, 301 Thomas Ave N, Minneapolis, Mn 55405.

12.      Magis Corporation, 301 Thomas Ave N, Minneapolis, Mn 55405.

13.      Christopher Haqq, 5312 Schaefer Rd, Edina, MN 55436.

## JURISDICTION AND VENUE

14.      This Court has jurisdiction over Count I and the Defendants pursuant to 28 U.S.C. Section 1331, because the claims arise under federal law.

15.      This Court has jurisdiction over Counts II through XII the Defendants pursuant to 28 U.S.C. Section 1367, because joinder is required, and the counts are so related to Count I that they form the same case or controversy.

16.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1390(b) because the defendants reside in this judicial district and/or a substantial part of the events or omissions giving rise to this lawsuit occurred in this judicial district.

## FACTUAL ALLEGATIONS

### *History of Jasser Zaabri*

17.     Zaabri has been working as a sales manager since 2016 for construction companies.

18.     He is a well-known sales genius that has remarkably increased revenue for companies that he worked.

19.     Zaabri has history in created sales teams with a proven method for success creating incentive driven opportunities for various level sales individuals and instituted that program into Defendant companies.

20.     Zaabri oversaw the sales teams ensuring that they were successful.

21.     Zaabri was highly regarded by all sales teams at Defendant companies.

### *Zaabri meets the Defendants*

22.     In August 2019, Zaabri was introduced to Haqq who owned the companies[2] Magis, Double G, and Elysian Construction by current employee Timothy Smolik.

23.     Smolik heard that Zaabri would be leaving his current company and was looking for another opportunity to grow.

24.     As such, Smolik scheduled a meeting with the owners of Defendant companies.

---

[2] Upon information and belief, the various Defendant companies share employees, business staffing, and resources and conduct business in Minnesota, North Carolina, Texas, Iowa and Florida. In fact, Magis through their owner Christopher Haqq has stated before a Minnesota administrative board facts connecting Double G Construction to the interworking relationship of Magis.

25.     After hearing of Zaabri's success, Haqq, in particular, wanted to lure Zaabri into Defendant companies to work as a salesperson after discovering Zaabri's ability to sign clients and make substantial profits for his companies.

26.     At this initial meeting, Zaabri discussed his work at a former construction company and his ability to create a powerful sales force teams for the Defendants.

27.     At a second meeting, Haqq and Antenello made Zaabri an offer and executed an agreement before the Human Resources Director.

### *Zaabri Enters Agreement with Defendants*

28.     Zaabri executed an agreement that contained terms that he would sale Defendants companies to customers seeking construction services related to storm repair.

29.     The contract specifically stated that Zaabri would receive 10 percent of revenue from every job turned into the company and 5 percent of revenue for every job turned into the company by Jay Zaabri's team members Khalil Zaabri.

30.     In addition, Zaabri would make 60 percent of profit from jobs that Zaabri or his team would obtain.

31.     Defendants would provide corporate housing and a corporate vehicle for employment.

32.     Overtime, the Defendants changed the terms of the agreement to include that Zaabri would be paid a percentage of his anticipated revenue and his teams revenue generation from the company.

33.     The contract terms contained a non-compete clause that was extremely restrictive.

### *Defendants Employed Unjust Tactics*

34.     Unfortunately, and unknown to Zaabri, the Defendants were not running a legitimate and honest business and eventually refused to pay Zaabri and others for their work.

35.     The Defendants also never disclosed to Zaabri that they intended to place false charges upon his wages and earnings that violate Minnesota Employment laws including but not limited to financial penalties for not attending mandatory meetings, refusing to take drug tests, not traveling to certain markets within the United States of America, for not working on weekends, deducting paychecks amounts for customer damage or complaints, fining Zaabri $100, $400, $800.00 whenever the company felt like it and taking away 50% of commissions for customer's not signing a contract with the company within 24 hours, and taking all of the commissions from sales if a customer does not sign with a particular law firm, or go to an adjuster's meeting, or entice the customer to sue the insurance company for payment of jobs.

36.     Defendants were experienced litigants with prior allegations of failing to pay employees for their work, taking aggressive positions against their employees if they refused to work 7 days a week, pay their "draws" to the company, and created a scheme to cheat hard-working individuals with excessive fines, false reimbursements for housing and other undocumented expenses, and then suing employees for not paying the company.

37.     Many times, employees were left working many hours only to learn that they are thousands of dollars in debt with the Defendants.

38.     After Hurricane Irma, Defendants through Haqq publicly stated that he wanted to get rid of certain "low performing sale persons".

39.     After Hurricane Irma, Defendants through Haqq publicly stated that he wanted to get rid of certain "low performing sale persons" and rebuild. Haqq stated he wants to only keep a

lean team and get rid of disengaged reps and only keep and pay the reps that are fully engaged with the Defendants.

40.    To do this, Defendants concocted a plan to force salespersons to leave by not paying their wages.

### *Defendants Admit that They Owe Zaabri Money*

41.    After working Defendants for some time, Zaabri realized that Defendants were not paying jobs that had been capped out or was due to him through their employment agreement.

42.    Zaabri upon numerous occasions requested an accounting of past jobs and revenue accounts receivables.

43.    However, Defendants did not provide information or provided incorrect or false information to Zaabri.

44.    Eventually, Zaabri was informed that he entitled to more than $750,000.00 on projects where down payments have been received from the customers, more than $1,500,000.00 million for commissions and fees on other projects in the pipeline and approximately $700,000 in percent of revenue overrides based on projections that Zaabri was able to obtain in late 2021. After further review, Zaabri has now calculated that more than $4M is owed to him not included penalties and interest payments.

45.    While there are several moving pieces to do a final accounting, the plethora of project information is in Defendants' possession that they refuse to provide to Zaabri.

46.    The accounting information for Zaabri's wages is found on the HubSpot customer relationship management software that was manipulated after Defendants' receipt of Zaabri's

litigation hold. The manager of the HubSport, J.P. Wartman, controlled and has information to the accuracy of Zaabri's past wages.

47.    The Chief Financial Officer Luke Januszewski previously provided project updates to Zaabri, which included the name of each project, projected revenues, and projected commissions, as well as the "splits" on each project.

48.    These projections have been used by Defendants for purposes of draws, payroll and to calculate buyouts. It is our understanding that this information is also maintained in the CRM program[3], HubSpot[4], which provides Defendants with easy, searchable access to specific project details.

49.    Despite having this information, Defendants collectively failed to provide any accounting or information.

50.    Most telling, Defendants also failed to pay accurate wages to Zaabri knowingly withholding payments to him from jobs that were capped out and due to be paid to him and his sales team.

### *Defendants Illegally Fine Zaabri and Deduct Pay*

51.    According to Minnesota Law Minn. Stat. 181.79, an employer is not able to deduct from wages broken equipment, lost money, or other employer losses unless after the loss occurs, the employee gives voluntary written authorizations to deduct from his wages or has been found liable for the loss by a court.

52.    According to Minnesota Law Minn. Stat. 177.24, an employer is not able to deduct consumable supplies used to do the employees job and travel expenses incurred for work.

---

[3] CRM means client management software.
[4] Hubspot is a particular software.

Additionally, the deductions cannot bring the employees wages below the state minimum wage and must be paid back to the employee upon leaving the employment.

53.    Zaabri was fined $800.00 multiple times for "waiting on" a customer for choosing shingles or other items for the homeowner.

54.    Zaabri was fined $100, $400 and $800.00 multiple times for "waiting on" fees and fines and had overrides, wages and commissions striped away from him as penalty.

55.    For example, Magis HR personal Kelly Sacchetti informed Zaabri that his pay was being reduced for a "Matthew Sheldon Job". The email dated December 2, 2020 stated:

> *"Hi Jay,*
> *I just wanted to give you the head's up that I have*
> *Been instructed to withhold $1000 from your pay this week,*
> *regarding the Matthew Sheldon job."*
> *Kelly Sacchetti*
> *HR Manager, Magis, LLC*
> *(219)310-7538"*

56.    Zaabri also received wage deductions if a homeowner fails to pay their deductible.

57.    Zaabri also received wage deductions for cancellations out of his control or if a homeowner fails to pay their deductible

58.    Also, Zaabri's pay was deducted for customer's not signing a contract with the company within 24 hours and taking half of the commissions from sales if a customer does not sign with a particular law firm, or go to an adjuster's meeting, or entice the customer to sue the insurance company for payment of jobs.

59.    Zaabri and other employees were told to encourage homeowners to seek the assistance of law firms chosen by Defendant Corporations to sue insurance companies to obtain payment for their revenues.

60.    Zaabri never agreed to these deductions in writing.

61.    Also, Minnesota State law requires employers to provide employees with restroom time and sufficient time to eat a meal. If the break is less than 20 minutes in duration, it must be counted as hours worked.

62.    Time to use the nearest restroom must be provided within each four consecutive hours of work. Mealtime must be provided to employees who work eight or more consecutive hours according to Minnesota Statutes 177.253 and 177.254, and Minnesota Rules 5200.0120 for more information.

### *Defendants Trail of Debts and Employee Allegations and Defendants' Coverup*

63.    The Defendants' penchant for defrauding and not paying employees left behind a trail of victims beyond the victims named in this complaint.

64.    At this time, there are unpaid employees, with many of them pursuing actions in court for unpaid wages and other illegal actions by the Defendants.

65.    Next, the Defendants' also lied to others about monies they collected from customers avoiding paying employees for commissions.

66.    When Defendants, especially Haqq learned of the potential lawsuits, he attempted to pay potential claimants' money not to speak to Zaabri and attempted to withhold wages until they executed a "non-disclosure agreement". Magis also threatened Mino Habib, Justin Killatrick, Edgar Harutunyan, Liam Hawkins, Zach Favalaro, Khalil Zaabri, William Meyer, Richard Dombroff to execute NDA's or they will withhold payments, wages and information to avoid evidence from appearing in various lawsuits.

## CAUSES OF ACTION

### COUNT I
### (Civil RICO, 18 U.S.C. Section 1964 – All Defendants)

67.    Zaabri realleges, as if fully set forth herein, all allegations in Paragraphs 1 to 67 above.

68.    An ongoing and continuing enterprise of actual and/or fraudulent inducement to fine, avoid paying wages, and creating a scheme to steal money from employees.

69.    Defendant Haqq was associated with the enterprise by virtue of his controlling positions.

70.    Haqq directly participated in the conduct of the affairs of the enterprise, including, but not limited to, by unlawfully misleading, lying and fraudulently levying fines, false draws, withholding money owed to employees when work was completed and money received from customers and other financial improprieties to their unwitting employees.

71.    Haqq participated in the enterprise through a pattern of racketeering activity, which consisted of the knowing and willful commission of more than two racketeering acts.

72.    This racketeering activity included multiple instances of wire and mail fraud victimizing Zaabri who is only one of the employees that fell victim to these activities.

73.    On or about the dates set forth below, in and/or purposely directed at the State and District of Minnesota, and for the purpose of executing a scheme or artifice to defraud, manipulate, falsely charge draws, fail to pay commissions owed, and levy false fines, Haqq and Antonello did knowingly cause to be transmitted in interstate commerce numerous writings, signals, and sounds with receiving money under deceit through the corporate enterprise. Many times, employees would make hundred of thousands for the company only to find they are in debt due to high draws and false fines.

74.    Haqq uses company's black American express credit card to splurge at events such as Art Basel in Miami meanwhile sales reps owed wages are not being paid and can't pay rent.

75.    Haqq and Antonello accordingly violated 18 U.S.C. Section 1962.

76.    A threat of repetition of Haqq's unlawful behavior exists given the years-long pattern of racketeering activity in which Haqq has engaged, which as affected multiple victims in various but related matters.

77.    As a direct and proximate result of Haqq's violation of 18 U.S.C. Section 1962, Zaabri has suffered damages in an amount to be determined at trial.

**COUNT II**
**(Breach of Contract – Against All Defendants)**

78.    Zaabri realleges, as if fully set forth herein, all allegations in Paragraphs 1 to 78 above.

79.    Zaabri and Defendants formed multiple contracts that required Defendants to pay Zaabri commissions or compensation when payments were made by the insurance company and/or customer.

80.    Zaabri performed his end of the contract by raising more than 50M in revenue

81.    Defendants have materially breached the contracts.

82.    As a direct and proximate result of Defendant's breaches, Zaabri has suffered damages in an amount above $75,000 and to be determined at trial.

**COUNT III**
**(Promissory Estoppel – Against All Defendants)**

83.    Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 83 above.

84.     Alternatively, and/or in addition to the breaches of contract, Defendants made multiple clear and definite promises to Zaabri that they would pay him outstanding commissions timely and that Zaabri efforts to bring in more sales staff would be lucrative to him, that the sales staff would be paid, and that they would eventually pay back all past debts to employees and him.

85.     It was foreseeable to Defendants that Zaabri would rely upon their promises and Zaabri did rely on their promises to his detriment.

86.     Defendants' promise must be enforced to prevent injustice.

87.     As a direct and proximate result of Defendants' wrongful conduct,

## COUNT IV
### (Account Stated – Against All Defendants)

88.     Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 88 above.

89.     Zaabri worked for over 2 years for the Defendants bringing in money to the company in which he was to make a percentage of commission.

90.     Zaabri was never paid for money by way of wages and commissions for made for Defendants after numerous requests.

91.     While there are several moving pieces to do a final accounting, the information is in Defendants' possession.

92.     Zaabri has made numerous requests for accounting information but has not received information.

93.     Defendants made repeated promises, both orally and in writing, that he would be paid for his work.

94.     Until Zaabri threatened litigation to recover the outstanding commissions, at no time did Defendant's object in writing that no commissions were owed to Zaabri.

95.     As such, Zaabri had to file this lawsuit in order to account for commissions, back wages, and other expenses that have been kept from him.

96.     Zaabri believes that the Defendants personal accountant and financial department is in control of this information.

97.     Based on the above, Defendants are liable to Zaabri for the account stated in an amount in excess of $75,000, the exact amount to be proven at trial.

## COUNT V
### (Negligent Misrepresentation – Against All Defendants)

98.     Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 98 above.

99.     Zaabri worked for approximately 2 years for the Defendants bringing in money to the company in which he was to make a percentage of commission.

100.    In the course of Defendants' business, profession or employment where they had a pecuniary interest in Zaabri's sales acumen in getting clients, Defendants' supplied false information to Zaabri enticing him to continue to work without pay by telling him that payments on jobs have not been completed or were reduced by construction defects or client complaints. This was not true.

101.    Defendants are subject to liability for the pecuniary loss, expected or future pecuniary loss of Zaabri, caused to him by the justifiable reliance upon the multiple misrepresentation by Defendants.

102.    Defendants failed and refused to exercise reasonable care or competence in obtaining or communicating the misrepresentations.

103.    Zaabri is entitled to but not limited to recovery of damages equivalent to his "out of pocket" losses, along with any special damages naturally and proximately caused by the fraud prior to their discovery, including expense incurred in mitigating the damages.

104.    Based on the above, Defendants are liable to Zaabri for the account stated in an amount in excess of $75,000, the exact amount to be proven at trial.

## COUNT VI
### (Fraudulent Misrepresentation – Against All Defendants)

105.    Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 105 above.

106.    Zaabri has alleged sufficient facts and evidence and plan on introducing added evidence, in further proving intent of Defendants collectively.

107.    Defendants continually manipulated documents, failed to tell Zaabri when jobs were completed and paid in full, provide accurate accounting to Zaabri, and made false representations to Minnesota Agencies about Zaabri's employment.

108.    Defendants' misrepresentations of paid jobs and other expenses that they sought reimbursement from Zaabri were knowingly inaccurate and failed to disclose information pertaining to certain jobs.

109.    Defendants' representations were false, and yet Zaabri believed them and relied upon them to his detriment for many months.

110.    Defendants' conduct were done intentionally and knowingly thereby damaging Zaabri by their conduct and actions.

111.    Defendants harbored an intent to blackmail and then defraud Zaabri from the day Zaabri initiated his employment with Defendants.

112.    Defendants acted in bad faith and malice after learning of Zaabri's employment claim and lawsuit by calling other employees enticing them with money to refrain from working with Zaabri or suing the Defendants.

113.    Zaabri has been damaged in excess of $75,000.00 to be proven at trial.

**COUNT VII**
**(FAILURE TO PAY WAGES PURSUANT TO MINN. STAT. 181.13 - ALL DEFENDANTS)**

114.    Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 114 above.

115.    Employers must pay employees their wages in a timely manner and the Defendants in this case failed to do so with Plaintiff.

116.    "Wages" may include accrued vacation, unused vacation, or paid time off, as well as non-discretionary bonus payments, and commissions based on an employer's particular policies or practices. To date, Plaintiff is owed a significant amount of money from commissions not paid.

117.    If the employer does not pay wages within 24 hours of demand, the employer may be liable for a penalty of up to 15 days of additional wages plus costs and attorney's fees. Plaintiff has requested wages multiple times without success.

118.    The employer must make the wages available at the usual place of payment unless the employee requests payment through the mail. To date, Defendants have denied Plaintiff's multiple requests for money.

119.    If the employee requests payment by mail, the wages are considered paid as of the date of the postmark.

120.    Employees who resign are entitled to be paid their wages or commissions earned by the employer's next regular payday.

121.    If resignation occurs less than five days before the next regular payday, however, then the employee must be paid by the second regular payday after resignation. In any event, the employee must be paid within 20 days.

122.    The penalty to an employer for failing to provide payment within this time period is payment of up to 15 days of additional wages.

123.    Employers must also pay earned commissions to salespersons who are paid on a commission basis and who are independent contractors and not employees.

124.    If the employer fails to pay an employee the wages, salary, gratuities, earnings, or commissions at the employee's rate of pay, or at the rates required by law (including time and one-half for overtime) they have violated the law and Defendants have failed to pay wages to Plaintiff.

125.    Defendants engaged in wage theft by directly or indirectly causing Plaintiff and employee to give a representation that they were paid greater wages than they were actually paid.

126.    Defendant further engaged directly or indirectly demanding or receiving rebates or refunds from the wages owed the employee under contract of employment.

127.    Defendant also attempted to make, or attempt to make appearances that wages paid to Plaintiff were greater than the amount actually paid.

128.    The new Minnesota wage law provides criminal penalties for employers who commit wage theft. The penalties range up to 20 years imprisonment, a fine of up to $100,000, or both, if the wage theft exceeds $35,000.

129.    Zaabri has been damaged in excess of $75,000.00 to be proven at trial.

## COUNT VIII
## (FAILURE TO PAY WAGES UPON TERMINATION)

130.     Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 130 above.

131.     Employers must pay discharged employees within 24 hours of their demand for wages. Defendants have failed to by Zaabri wages after demand and termination.

132.     "Wages" may include accrued vacation, unused vacation, or paid time off, as well as non-discretionary bonus payments, based on an employer's particular policies or practices.

133.     If the employer does not pay wages within 24 hours of demand, the employer may be liable for a penalty of up to 15 days of additional wages plus costs and attorney's fees.

134.     The employer must make the wages available at the usual place of payment unless the employee requests payment through the mail.

135.     If the employee requests payment by mail, the wages are considered paid as of the date of the postmark.

136.     Employees who resign are entitled to be paid their wages or commissions earned by the employer's next regular payday.

137.     If resignation occurs less than five days before the next regular payday, however, then the employee must be paid by the second regular payday after resignation. In any event, the employee must be paid within 20 days.

138.     The penalty to an employer for failing to provide payment within this time period is payment of up to 15 days of additional wages.

139.     Employers must also pay earned commissions to salespersons who are paid on a commission basis and who are independent contractors and not employees, when either the salesperson or the employer terminates the relationship.

140.     If the employer terminates the salesperson or if the salesperson resigns with at least five days written notice, the employer must pay commissions earned through the last day of employment on demand no later than three working days after the salesperson's last day of work.

141.     If the salesperson resigns without five days' written notice, the employer must pay earned commissions earned through the last day of employment on demand no later than six working days after the salesperson's last day of work.

142.     For these purposes, the term "commissions earned through the last day of employment" means commissions due for services or merchandise that have been delivered to and accepted by the customer by the final day of the salespersons' employment.

143.     If the employer fails to pay the commissions within the times specified, the employer is liable not only for the unpaid commission, but also for a penalty in an amount equal to 1/15 of the salesperson's commissions earned through the last day of employment, for each day up to fifteen days that the commissions go unpaid, plus attorney's fees.

144.     If the discharged or resigning employee or salesperson was entrusted with the handling of money or property during employment, the employer has ten working days after the termination of employment to audit or adjust the employee's accounts before wages or commissions are payable. No penalties will accrue during this ten-day period.

145.     The Defendants have failed to provide Zaabri with payment after he was terminated. Zaabri has been terminated from the Defendants company for many months and has yet to be paid past wages and commissions. Defendants have admitted that Zaabri is owed money.

146.     Zaabri has been damaged more than $75,000.00 to be proven at trial.

**COUNT IX**
**(FAIR LABOR STANDARDS ACT)**

147.     Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 147 above.

20

148.    Employers must pay minimum wages and overtime pay to each employee, including part-time employees, for all hours worked, unless an employee is specifically exempt from the law.

149.    The federal Fair Labor Standards Act ("FLSA") covers employees of enterprises whose workers are engaged in interstate commerce, or handle, sell, or otherwise work on goods or materials that have been moved in or produced for interstate commerce.

150.    Minnesota also has a statute regulating minimum wages and overtime.

151.    Although most employers and their employees in Minnesota are governed by the federal FLSA, Minnesota's provisions apply if they are more favorable to the employee.

152.    Defendants' collective action have violated the FLSA. Defendants have and pursuant to the facts above have sent Plaintiff across state lines to engage in interstate commerce with sister companies. Defendants caused Plaintiff to work 7 days a week, fined the Plaintiff for not working overtime, and withheld wages as a punishment.

153.    Zaabri has been damaged more than $75,000.00 to be proven at trial.

## COUNT X
### (Wage Deduction Violation-Against All Defendants)

154.    Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 154 above.

155.    Only if the employee makes the proper written authorization, may the employer make the following deductions from an employee's wages.

156.    No deductions may be made for the following items if the deduction would reduce an employee's wages below minimum wage, or if the deduction exceeds $50.00.

157.    Purchased or rented uniforms or specially designed clothing required by the employer, by the nature of the employment, or by law, which is not generally appropriate for use

except in that employment; • Purchased or rented equipment used in employment, except tools of a trade, a motor vehicle, or any other equipment that may be used outside the employment;

158.    Consumable supplies required in the course of that employment; and

159.    Travel expenses incurred in the course of employment except those incurred in traveling to and from the employee's residence and place of employment.

160.    When the employee's employment is terminated, the employer must reimburse the full amount deducted for any of the items listed above, and the employer may require the employee to return the items for which the employer provided reimbursement.

161.    The employer may not, however, hold the employee's final check if the employee fails to return such items. An employer may not deduct from an employee's wages any amount for lost, stolen, or damaged property, or recover any claimed amount owed by the employee to the employer, unless the employee voluntarily authorizes the employer in writing to make the deduction after the loss has occurred, or unless the employee is found liable by a court for the loss or indebtedness.

162.    Any written authorization must specify the amount to be deducted from the employee's wages during each pay period.

163.    Defendants did deduct from wages illegal fines, equipment losses, damages occurring at the construction site and other wrongful wage loss deductions without Zaabri's approval.

164.    As a result, Zaabri has been damaged more than $75,000.00 to be proven at trial.

**COUNT XI**
**(UNJUST ENRICHMENT-All Defendants)**

165.    Zaabri realleges, as if fully set forth herein, all allegations in Paragraph 1 to 165 above.

166.    Defendants are liable of unjust enrichment because they benefited from the work of Zaabri and windfall of unpaid commissions that were owed to Zaabri.

167.    Under Minnesota law, Defendants are required to pay restitution to Zaabri for the benefit received by them in which they unjustly used and unjustly enriched themselves.

168.    Defendants knowingly received Zaabri's commission money that they were not entitled, and the circumstances were such that it was unjust for Defendants to spend that money.

169.    It would be unjust for Defendants to retain and profit from the unpaid commissions currently in their possession.

170.    As a result, Zaabri has been damaged in excess of $75,000.

### COUNT XII
### (CIVIL CONSPIRACY-AGAINST ALL DEFENDANTS)

171.    Harutyunyan realleges, as if fully set forth herein, all allegations in Paragraph 1 to 171 above.

172.    "To establish civil conspiracy, a claimant must show that two or more people worked together to accomplish (1) an unlawful purpose or (2) a lawful act by unlawful means." *Robert Allen Taylor Co. v. United Credit Recovery, LLC*, No. A15-1902, 2016 WL 5640670, at *11 (Minn. Ct. App. Oct. 3, 2016)(citing *Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 230 Minn. 327, 337, 41 N.W.2d 818, 824 (1950)).

173.    Here, the Defendants' are two or more people that worked together to accomplish the following unlawful purposes, which include but are not limited to:

- Wrongfully withholding the commissions owed to Harutyunyan for the work he performed in violation of state and federal wage and labor statutes;

- Fraudulently or negligently misrepresenting the commissions that Harutyunyan was owed for the work he performed during his employment with the Defendants; and,

- Furthering an illegal racketeering enterprise.

174.    As a result of Defendants' concerted actions in furtherance of the above stated unlawful purposes, Harutyunyan suffered damages in an amount exceeding $75,000.

## JURY TRIAL DEMANDED

Zaabri demands a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Zaabri demands judgment as follows:

1. Finding in Zaabri's favor, and against Defendant, on all claims.

2. Awarding Zaabri's the full measure of damages permitted by law, including treble damages for Count I.

3. Ordering Haqq, Antonello, Grosso, and Palmiere to divest themselves of any interest, direct or indirect, in the enterprise.

4. Imposing reasonable restrictions on the future activities of Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the enterprise engaged in.

5. Ordering dissolution of the enterprise, making do provision for the rights of innocent persons.

6. Awarding Zaabri his attorneys' fees associated with this matter.

7. Awarding Employment

8. Awarding Zaabri such other and further legal and equitable relief as the Court may deem appropriate.

**THE HUTTON FIRM, PLLC**

February 24, 2023                    */s/ Lee A. Hutton, III*
                                     Lee A. Hutton, III (Atty No. 0327992)
                                     SPS Tower
                                     Suite 2150
                                     333 South Seventh Street
                                     Minneapolis, Minnesota 55402
                                     E: lhutton@thehuttonfirm.com

**ATTORNEYS FOR PLAINTIFF**

**VERIFICATION STATEMENT**

I have read the foregoing VERIFIED COMPLAINT and know its contents. That I am informed and believe and, on that ground, allege that the matters stated in the foregoing document are true. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of Minnesota that the foregoing is true and correct.

***/s/ Jasser Zaabri***